UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

       Plaintiff,

 -vs-                           Case No. 18-CR-29-WMC

MARK E. BARTZ,                Madison, Wisconsin
                                October 4, 2018
        Defendant.         2:15 p.m.

_____

STENOGRAPHIC TRANSCRIPT OF SENTENCING
HELD BEFORE U.S. DISTRICT JUDGE WILLIAM M. CONLEY

APPEARANCES:

For the Plaintiff:

                Office of the United States Attorney
                BY:  ELIZABETH ALTMAN
                Assistant United States Attorney
                222 West Washington Avenue, Suite 700
                Madison, Wisconsin  53703

For the Defendant:

                Federal Defender Services of Wisconsin
                BY:  JOSEPH A. BUGNI
                22 East Mifflin Street, Suite 1000
                Madison, Wisconsin  53703

Also appearing:      MARK E. BARTZ, Defendant
                RICHARD WILLIAMS, U.S. Probation Officer

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

```
1              (Proceedings called to order at 2:15 p.m.)

2              THE CLERK:  Case No. 18-CR-29, the United States of

3      America v. Mark E. Bartz, called for sentencing.

4          May we have the appearances, please.

5              MS. ALTMAN:  Good afternoon, Your Honor.  The United

6      States appears by Elizabeth Altman.

7              MR. BUGNI:  Good afternoon, Your Honor.  Joe Bugni

8      appearing on behalf of Mark Bartz.

9              THE COURT:  Good afternoon, all.

10         We are here for the sentencing of Mark Bartz, and my first

11     obligation, Mr. Bartz, is to confirm that you've had an

12     opportunity to read and discuss the presentence report and the

13     addendum to that report with your counsel.

14             THE DEFENDANT:  Yes, I have.

15             THE COURT:  Then I'll turn to you, Ms. Altman, to

16     confirm that the government is moving for an additional

17     one-level reduction for acceptance of responsibility.

18             MS. ALTMAN:  Yes, Your Honor.

19             THE COURT:  And also to ask whether or not there are

20     any victims who wish to speak.

21             MS. ALTMAN:  Yes, Your Honor.

22             THE COURT:  Then I'll -- we'll address them shortly.

23     Can you also tell me the status of restitution at this point?

24     Has there been any progress made there?

25             MS. ALTMAN:  What I can tell you is that the older
```

1    child has begun exhibiting some behavior problems.  The mother

2    has consulted with a pediatrician.  If they continue in the near

3    future, I believe that there will be an assessment done, and we

4    would like restitution left open so that if there's going to be

5    treatment needed in the near future, that that can be addressed.

6    I know we have 90 days to -- I mean, we can't wait forever to do

7    it obviously, but there has been initial discussions about some

8    behavioral problems.

9         THE COURT:  And I'm not -- I will give you what time I

10   can under the statute.  Given the severity of the crime and the

11   amount of time this defendant is likely to do, I'm not sure it

12   isn't more than a pyrrhic exercise, but certainly the victims

13   are entitled to make a showing if they wish to, so we'll deal

14   with that --

15        MS. ALTMAN:  And they do understand, Your Honor, that

16   it may be symbolic only.

17        THE COURT:  Understood.  All right.  With those

18   preliminaries then, I will accept the plea agreement finding

19   that the offenses of conviction adequately reflect the

20   defendant's criminal conduct.  The plea agreement does not

21   undermine the statutory purposes of sentencing.  In determining

22   the defendant's sentence, I will take into consideration the

23   advisory sentencing guidelines and be governed by the statutory

24   purposes of sentencing that are set forth at Section 3553(a) of

25   Title 18.

1    The parties provided clarifications that were incorporated

2    into the revised presentence report, but they do not affect the

3    guidelines.  Accordingly, I find the probation office calculated

4    the advisory guidelines correctly using the current guidelines

5    manual and taking into account all relevant conduct under

6    Section 1B1.3.

7    Here the relevant crimes of conviction are subject to a

8    multiple-count analysis under Sections 3D1.2 and 1.4 because

9    they involve separate victims and separate harms.

10   Specifically, as to Count 1, the guideline for production

11   of child pornography in violation of Section 2251(a) of Title 18

12   is found at Section 2G2.1.  The base offense level is 32 under

13   2.1(a).

14   Because at least one of the images depicts a minor who had

15   not yet attained the age of 12, an increase of four levels is

16   warranted under subsection 2.1(b)(1)(A).

17   Moreover, because the defendant knowingly distributed the

18   images of that minor, another two-level increase is warranted

19   under 1(b)(3).

20   Next, the images involved the abuse of an infant or

21   toddler, resulting in yet another four levels under 1(b)(4).

22   Finally, because the minor was left in the care of the

23   defendant, a two-level offense increase is warranted under

24   1(b)(5).

25   Since no other Chapter Two adjustments apply, the

1    defendant's adjusted offense level for Count 1, what we'll call

2    group A, is 44.

3           As to Count 2 and group B, the guideline for the

4    defendant's production of pornography using a different child

5    results in a second violation under Section 2251(a) and again 32

6    levels as a base offense under 2G2.1(a).

7           Because under Count 2 at least one of the images depicts a

8    minor who had not yet attained the age of 12, he again receives

9    a four-level increase.

10          Moreover, at least one of the images shows the defendant

11   inserting his penis into the mouth of a minor, resulting in a

12   two-level increase under 1(b)(2)(A).

13          Two offenses -- two offense levels are then added under

14   1(b)(3) and four more offense levels under 1(b)(4) because the

15   defendant knowingly distributed the images of the minor and the

16   images depict the sexual abuse of an infant, respectively.

17          Finally, because the minor was also left in the care of the

18   defendant, another two-level increase is warranted under

19   1(b)(5).

20          Since no other Chapter Two adjustments apply, the

21   defendant's adjusted offense level for group B is 46.

22          According to the multicount analysis under Section 3D1.4,

23   two levels are added to the highest adjusted group offense

24   level, in this case group B, resulting in an adjusted offense

25   level of 48.

1       Under Section 4B1.5(b)(1), yet another five-level increase

2   is called for because the offense of conviction is a covered sex

3   crime, and the defendant engaged in a pattern of activity that

4   involved sexual conduct, including -- I should say involved

5   repeated prohibited acts of sexual abuse against one -- against

6   one or more -- against more than one minor.

7       The defendant does qualify for the three-level downward

8   adjustment under Section 3E1 because he demonstrated acceptance

9   of responsibility by pleading guilty and by virtue of the

10  government's motion and his cooperation with the authorities

11  once caught.

12      Ordinarily this would result in a total offense level of

13  50, one of the highest offense levels that can be brought before

14  a court, certainly among the highest this court has ever seen.

15  However, under Chapter 5, Part A, comment note 2 of the

16  guidelines, when the offense level exceeds 43, then it must be

17  treated as a level 43.

18      With a total offense level of 43 and a criminal history

19  category of I, therefore, the defendant has an advisory

20  guideline imprisonment range of life in prison, although in this

21  case by virtue of the statutory cap of 60 years on the two

22  counts if imposed consecutively, the guideline range is

23  essentially 60 years.

24      The gravity of the defendant's conduct is reflected in the

25  guidelines, and notwithstanding defense counsel's passionate

1  advocacy in his memorandum, it is very hard to find mitigating

2  factors for this defendant given the gravity and depravity of

3  his conduct.  In particular, it's really hard to give any --

4  treat any mitigation for what's described as true remorse by the

5  defendant because he's engaged in this activity, and it's only

6  gotten worse.  It may be now that he finally appreciates at

7  least the gravity of his conduct, but it's a little hard for me

8  to measure what part of that remorse is for having been caught

9  and what part is really understanding the ravages that he's left

10  in his wake.

11      I do think that defense counsel is right to point out that

12  we don't know about this particular defendant's amenability to

13  treatment and reforming, and he certainly will be -- although

14  this wasn't discussed by either side -- vulnerable as a victim

15  inside but likely placed somewhere where he can get treatment

16  and, therefore, less likely to be as vulnerable as he would be

17  in an ordinary prison population.  And certainly the defendant's

18  upbringing, although far better than most that come before the

19  Court, was marked by substantial surgeries and the psychological

20  abuse associated with a cleft palate and some 29 surgeries that

21  he probably did receive from his peers, but, again, it's hard to

22  treat that as particularly mitigating given the severity of the

23  crimes that we're talking about.

24      Defense counsel suggests that the Court should take in the

25  fact that Congress is throwing the book at everyone involved in

1    child pornography and keeps raising the sentences.  That's

2    certainly true, but for a serial child abuser, I'm not sure even

3    the most dispassionate would not say that it's among the most

4    abhorrent crimes that one can commit.  You're not talking about

5    viewing child pornography, however pernicious that can be in

6    creating a market.  You're talking about abusing children in the

7    most vile ways imaginable, and I know defense counsel wasn't

8    suggesting there shouldn't be a severe punishment, but I'm not

9    sure, again, that you could make a case like first-degree murder

10   that this is not as abhorrent conduct as we have in society.

11        So I'm having a great deal of difficulty finding reasons to

12   mitigate except perhaps the possibility of redemption in prison

13   and particularly the possibility that some treatment might

14   assist.  At the age of 48, you know, that window is certainly

15   closing, but that's as much as I can find.  I haven't decided on

16   an exact sentence.  I know the government writes passionately

17   that -- and I think most effectively that similarly situated

18   defendants would face extremely harsh sentences -- if not life,

19   then very long sentences -- and is calling for 60 years, 720

20   months.  I can understand the argument.

21        In any event, I'll hear first from the government.

22        MS. ALTMAN:  Yes, Your Honor.  Would you like to hear

23   from me first or from the victim's mother first?

24        THE COURT:  It's entirely up to you how you want to

25   proceed.

1          MS. ALTMAN:  I will make my argument first, and then

2     depending on -- one of us will read a letter that she wrote.  I

3     will be brief.  I did cover most of my arguments in my

4     sentencing memo.  I would just like to point out a couple

5     things.

6          The first is that even if this case involved just one

7     victim, if he were only charged with abusing -- you know, Count

8     1 in the indictment and nothing else, he would be subject to 15

9     years.

10          THE COURT:  One five.

11          MS. ALTMAN:  One five, yes.  A sentence of 22 years

12     doesn't come close to taking into account the defendant's long

13     history of assaulting children.  The bottom line, and I think

14     it's spelled out pretty clearly in our sentencing memorandum and

15     you referred to it already, we believe that the defendant should

16     never ever get out of prison.  He should never have the

17     opportunity to victimize another person, another child.  22

18     years -- the defendant is asking for that -- that won't ensure

19     that he never gets out of prison, and a sentence of 60 years

20     would.

21          And the last thing I would like to say and probably the

22     most important thing that I would like to say, it's been alluded

23     to in a couple places, but this case came to law enforcement's

24     attention because the defendant was posting images of the

25     assaults online.  That's how NCMEC found out about it.  It

1    wasn't the case that a sexual assault got reported and the

2    police went to his house and found pictures that they were --

3    that hadn't been shared, which happens occasionally.  They were

4    discovered by NCMEC because he shared them with other people.

5        These pictures are out there forever.  They don't go away.

6    People have them.  From the statement that the children's mother

7    wrote, they're going to be dealing with the ramifications of the

8    defendant's crime forever.  The family has to face a lifetime of

9    knowing what happened to their children, and she's going to

10   explain to you, or I will by reading her statement, how it isn't

11   just the children that are affected but the parents as well.

12       The victims in this case, fortunately, are hopefully young

13   enough that they probably won't remember the abuse.  They're

14   very young, although, as Ms. Bilski will tell you, it appears

15   the older child may be suffering some of the effects, some of

16   the acting out which I previously mentioned.  In any event,

17   whether they remember it or not, by filming himself assaulting

18   these children and posting those images online, the defendant

19   himself has assured that these children face a lifetime of

20   knowing every single day that there's a possibility that someone

21   is looking at their images and getting pleasure from images of

22   them being sexually assaulted, their sexual abuse at the hands

23   of this defendant, every day for the rest of their lives.

24       Just as the parents and the children face a lifetime of

25   having to deal with the defendant's actions, the government

1    believes the defendant should also face a lifetime of that and

2    not just by supervised release but by spending the rest of his

3    life in prison.

4        The children's mother has written a report.  She has asked

5    me to read it.

6            THE COURT:  For my benefit, if you would just raise

7    your hand so I at least know where you're sitting.  Thank you

8    very much.  I appreciate it.

9            MS. ALTMAN:  A person's childhood is supposed to be a

10   time of innocence, love, laughter, and freedom.  Childhood is

11   not a time where one should have to endure dirty and shameful

12   acts forced upon them by an adult.  Since January 25th, my whole

13   family has been reeling and trying to find any means necessary

14   to deal with this horrible, scary, and disgusting truth.  The

15   children are going on with their day-to-day lives, but we, the

16   adults, are having to find new ways to cope and find trust in

17   those around us.

18       I got the call on the 25th while I was at work.  That is no

19   call that any parent should ever have to have.  I was bawling

20   hysterically at work, which was embarrassing enough, and then I

21   had to ask to leave work that instant, which, as a nurse, that

22   is no easy task.  That day was a full, busy day on the floor, so

23   to leave my co-workers short one nurse was especially painful,

24   but family needs come first.

25       I arrived at my parents' house where I saw a lineup of

1    cars.  When I got inside, I knew whatever they had to tell me

2    was bad, but little did I know how bad it truly was.  The day

3    was a blur for my husband and me, and we were questioned --

4    after we were questioned, we were asked if we wanted to take the

5    kids to the clinic for examination.  We agreed, and off we went.

6         For two little kids, routine is everything, and an

7    unexpected visit to the doctor is never in that routine.  So

8    when we arrived that afternoon, the kids were poked and prodded

9    at.  The tears and confusion that came from their faces broke my

10   heart even more.  The kids were off their schedule, missing

11   lunch, and went through things that kids should never have to go

12   through.

13        Since that day, I have had to quit my previous job because

14   the thought of leaving my kids with anyone, even my husband,

15   fills me with dread and unsurmountable anxiety.  My oldest child

16   is having battles of her own since that day as well.  She has

17   developed new anxieties to things like loud noises, dogs, and

18   being alone.  She will scream and cry and shake at the thought

19   of any of these.  Imagine a 3-year-old having a panic attack at

20   the thought of a parade or going to the park or sleeping in her

21   own bed in her room by herself at night.  I have been trying to

22   help her through this anxiety but at this moment may need to

23   seek outside help from a therapist.  I cannot be certain if this

24   anxiety is due to her age or what she has gone through because

25   we do not know what she has seen and endured at the hands of a

1    careless, vile, corrupt, and evil person all of those months.

2        The aftermath of this investigation was especially brutal

3    for my family.  We have had to tell all the close and extended

4    family members what happened because this is not something one

5    can sweep under the rug.  All the local newspapers had posted

6    articles on this, and it was on Facebook.  One evening I was at

7    work doing my hourly rounding on a patient when this news story

8    broke.  I was in the patient's room, and I immediately fell to

9    the floor and sobbed uncontrollably.  My co-workers heard what

10   was going on and immediately came to my aid.  They got me up and

11   to the locker room.  I gathered my composure and asked the

12   charge nurse if there was any way I could leave.  The next day

13   my manager called and wanted to discuss what happened.  I told

14   her the truth, but that truth was hard to tell.  This story was

15   not one I would ever think that I would have to tell.  It was

16   embarrassing to discuss that with her, although she understood

17   and told me to take time off if I needed and that there would be

18   no questions asked.  The support was great, but at the end of

19   the day, I grew resentment towards my job because they kept me

20   away from my kids, which led me to quit a few months later.

21       Writing this statement and coming today is perhaps one of

22   the hardest things I have ever had to face.  I didn't think that

23   I had the courage or the strength in me to come today.  I wanted

24   everyone to see how this man's actions have affected me and my

25   family.  I also wanted everyone to hear my words and to know how

1    I feel.  I also want to let everyone know that these two
2    beautiful children deserve to have a voice, and they deserve to
3    have a life free from this, though I am assured that these
4    images will come up many times in the future and forever haunt
5    them and all of us.  It will serve to constantly haunt us and
6    remind us of this crime.  We can erase this man from our lives,
7    but, unfortunately, those pictures or videos may never be fully
8    taken down.  These images will be impacting my children's lives
9    for possibly their whole adult life.  As a mom, that is a
10   thought that is impossible to bear.
11       After today one of my biggest fears will be laid to rest.
12   I will know that for some time hopefully this man will not be
13   able to harm my children or the lives of other children ever
14   again.  I know that someday I will have to tell them what
15   happened to them, but I am praying that it won't have to happen
16   for quite some time.  To have him out in society would mean I
17   would be living in constant fear and worry.  Again, my children
18   are my life.  My job as a mama is to guide, protect, educate,
19   and be a voice for them.  I am here today to be their voice.  No
20   one deserves to endure such actions by a person they trust, no
21   one.  No child who is vulnerable, innocent, and loving deserves
22   this inflicted on them.  No one should be able to get away with
23   this.  These actions are deplorable and from someone who fooled
24   everyone.  He is a con artist through and through.  He played
25   off being a Christian with morals when underneath it all hid a

1    corrupt, black soul with twisted, dark desires.  This is the

2    type of person I tried to protect my kids from, but it is hard

3    to protect your kids from a wolf in sheep's clothing.

4        Big thanks to the FBI and the others for giving my kids a

5    voice and raising those red flags.  I appreciate it from the

6    bottom of my heart.  I cannot imagine what more my kids would be

7    enduring if not for you all.  Thank you also to the judge

8    presiding over this case.  Thank you for bringing justice to my

9    family and especially to Aubrey and Colton.

10       THE COURT:  Ms. Altman, before I address the letter

11   itself, I assume that your victim coordinator is working with

12   the families here?

13       MS. ALTMAN:  We do -- yes.  My office is.  Our

14   victim/witness coordinator is out, but we've got people stepped

15   in, yes.

16       THE COURT:  And I'm more concerned about making sure

17   they're directed to the resources that are available for

18   counseling.

19       MS. ALTMAN:  We're working on that, yes.

20       THE COURT:  There was a mention, and I'm not going to

21   single you out, although I think part of the biggest problem

22   with this crime is that it's treated as something that you

23   should be ashamed of even though you're the victim.  There is

24   nothing, nothing, nothing to be ashamed of, and the sooner we

25   all take responsibility for this living nightmare I think you

1      said -- that's what it is; it should be for all of us -- and we

2      confront it openly -- and this is not your burden.  As the

3      victim, the last thing you should be burdened with is having to

4      become the spokesperson to shine a light on this, but you may

5      find over time that if you search out others who have been

6      victimized and you talk through -- and there are good groups

7      now, and you can find them easily.  One of the benefits of the

8      internet, along with the evils that are demonstrated in this

9      case, is that you can search out information.

10          More than that, I was particularly touched by your

11     statement that your children may need to undergo therapy, and I

12     know you've obviously done your own research on this and thought

13     about it.  Hopefully you're all in therapy, and you may be being

14     told that they're too young now to be involved in any way.  I'm

15     not sure all child therapists would agree with that, but most

16     important right now is you pursuing therapy so that you can find

17     positive ways for them.

18          Beyond that, you'll have to decide your comfort level in

19     stepping up.  It's not your burden, as I say, and the truth is,

20     as you say, very hard to tell, but it needs to be told, and

21     hopefully there's a way that society can make sure that victims,

22     particularly young, vulnerable, innocent children, are not

23     revictimized, and I can only urge you to take full advantage of

24     the victim coordinator who has resources that they can point you

25     to and pursue them like a squeaky wheel in the health care

1   system to make sure that all resources are available.

2       And don't underestimate the value over time.  The first few

3   times it may be awfully painful, and the natural inclination,

4   understandable, is to -- I think you said to try to put it

5   behind you, and yet it keeps comes up.  It's one of those things

6   that you can't put behind you fully, but you can start to

7   address it in productive ways over time after you get over the

8   horrible pain that will re-emerge each time you face it.  I

9   truly hope for you and your family and for the other victims'

10  family that that's something you can find over time.

11      I'll then hear from -- anything more that the defense

12  wishes to say.

13          MR. BUGNI:  Thank you, Your Honor.  It's clear the

14  Court has read the defense's remarks on this, and I think

15  there's three salient points to make.

16      As far as the ability to have true remorse, I think the

17  Court will hear Mr. Bartz's words and can judge for itself --

18          THE COURT:  And so we're clear, I'm not discounting the

19  possibility.  I'm saying that in terms of finding it mitigating

20  at this point, it's very hard to weigh it because the only

21  reason he's here is because he was caught, and maybe over time

22  through actions he can demonstrate it, but in terms of it being

23  a mitigating factor -- I hope, I truly hope, that he feels

24  remorse, tremendous remorse.  This is one place where shame has

25  value.

1          MR. BUGNI:  Agreed.

2          THE COURT:  And he can come out the other side of this

3     with therapy as a better person, but in terms of mitigation for

4     sentencing, I just don't know how to weigh that.

5          MR. BUGNI:  I think where it's weighed is that there

6     are some who are apologists for this behavior -- we've seen

7     that -- and then there are those who "Thank God I've been

8     caught.  Thank God that, like, I'm exposed and that I'm able to

9     have that," and I'm not saying that in each case this court has

10    to give a minus seven or a plus four, but there is that spectrum

11    that we've all dealt with in this courtroom that -- those who

12    truly say "This is the lowest I have ever done, this is

13    shameful, and I wish never to do it again, and it's terrible,"

14    and then those who are true apologists for, you know, their

15    sexual attraction to children.  There's a difference there.

16         THE COURT:  It's very hard to discern which is which in

17    an individual person, but I agree that's part of my

18    responsibility.

19         MR. BUGNI:  And I think that then the Court also has to

20    weigh is he amenable to treatment?  Is this somebody who at 70,

21    are we going to have somebody who the threat is still so great?

22    And if Mr. Bartz was 25 or 35, I would say he probably has to

23    get out at 70, and that realizes that it's not a life sentence,

24    that there are very few life sentences that society imposes.

25    Instead, it allows for the Court to have that discretion.  Even

1       murder one in Wisconsin allows for the Court to say after 20

2       years you can be released to society.

3               THE COURT:  First-degree murder it seldom happens that

4       way, Counsel, but I take your point.  Anything else you want

5       to --

6               MR. BUGNI:  The final point, Your Honor, is though this

7       is a most abhorrent crime, and I agree with that -- there is no

8       question how horrifying this is both as a father and just as a

9       human being -- but it is one that when we say what is just

10      punishment, it's one that we don't normally say you have to die

11      in prison for.  And the abhorrence of it is something that you

12      have to weigh, but it is balanced against everything else that

13      the Court also has to weigh looking at this offender and looking

14      at the needs of society, and if the Court can have a takeaway

15      that, you know, that Mr. Bartz at 70 or 75 poses a reduced risk,

16      a reasonable risk, especially under all the assurances that we

17      have with probation and just how old and tired he will be, the

18      Court can settle upon that number and say this is adequately

19      punished.  Adequate punishment at 27 years is not a small thing.

20      A 27-year sentence is not a small thing for a person.

21          Your Honor, I believe that that's something that this court

22      can weigh and balance, and when it thinks sufficient but not

23      greater than necessary, anywhere within that spectrum is

24      something allowing Mr. Bartz to have the opportunity to again

25      one day be released.

1       So with that, Your Honor, I'd ask -- Mr. Bartz has some

2    prepared remarks that he would like to say.

3            THE COURT:  And I would be very interested in anything

4    you have to say, Mr. Bartz.

5            THE DEFENDANT:  Your Honor, I've tried to write this

6    letter a million times, tried to find the right -- find the

7    words to say I'm sorry for what I did.  I know there's no way to

8    say it, but I am sorry for what I did, and I hope and pray

9    someday -- someday my family and people can forgive me for what

10   I did.  I pray the two little ones would never know what I did

11   or who I am.

12       Even though I have apologized to the family members, I'd

13   just like to say it again.  I'm sorry.  I was given a great gift

14   to watch over the kids, and I betrayed that trust to watch over

15   them.  I'm sorry I gave in to temptation.  I'm sorry.  A year

16   ago I asked God to stop me.  It was my mom's birthday a year ago

17   and -- and he finally has answered that prayer.  I'm sorry --

18   I'm sorry.  I just thank God he answered my prayers and he

19   stopped me and there's no more, Your Honor.

20           THE COURT:  Mr. Bartz, did you want to add anything

21   else?

22       Maybe that's a reasonable place to start.  It's hard to

23   find any saving grace in this, but perhaps the fact that you've

24   been stopped is one.  Your willingness to cooperate with therapy

25   and help therapists better understand who you are and what

1    motivated you so we can do better would be a really great place

2    for this to go.  That will require you to continue to be

3    painfully honest, something which was not your practice until

4    now.

5          It's more than a betrayal of trust.  I think the

6    description of being a wolf in sheep's clothing is really pretty

7    close to dead on.  You continually created opportunities,

8    knowing your predispositions, to continue to babysit children,

9    to take other steps to be around children -- there's really no

10   redeeming aspect to that; that's where the evil really lives --

11   and not to search out any kind of therapy until you were caught.

12   If you really want to show that you're sorry, you'll spend your

13   time in prison facing up to your conduct, participating in group

14   therapy, helping others recognize the same things that drove you

15   down this road, and helping therapists figure out how we can

16   stop it going forward.  That would be a demonstration of real

17   remorse.  I hope that's what you pursue.

18         I am prepared to render sentence.  The defendant was born

19   with a significant physical health condition which required

20   dozens of surgeries.  Particularly at the time, a cleft palate

21   was a much more serious and debilitating thing, and I don't

22   doubt that he was subject in childhood to untold physical abuse

23   by his peers.  Still, his parents provided a supportive home,

24   and it doesn't account for the development of the defendant's

25   interest in pedophilia.

1        As a very early teen, he was introduced to sex with others

2   his age, but he soon became a predator.  The defendant became

3   involved in a local community group, which gave him access to

4   young children whom he sexually abused.  Still a teen, the

5   defendant also admitted to abusing a younger relative.  Upon

6   graduating from high school, the defendant enlisted in the

7   United States Navy.  Due to several surgeries that he had

8   endured as a child, the structure of his hip was compromised,

9   and he eventually suffered an injury severe enough to warrant a

10  medical discharge.

11       Returning home, the defendant eventually relocated to

12  Minnesota and approximately five years later to the Marshfield,

13  Wisconsin, area where he purported to help a family member raise

14  her children.  Predictably by that point, the defendant again

15  instead sexually abused his minor relatives who ranged in ages

16  between approximately 8 and 18.  This abuse included digitally

17  fondling and performing oral sex on children, one of whom also

18  performed oral sex on him.  Among other truly frightening

19  statements by the defendant was his reporting to investigators

20  that he did not worry about the children telling their parents

21  because, in his words, they appeared to enjoy the activity.

22       The defendant was finally caught when he began to post

23  images depicting his sexual abuse of infant relatives in an

24  online chat room, which he administered.  The chat room itself

25  was established for the purpose of distributing and discussing

1    child pornography.  The images of the minor charged in Count 1

2    are tragically consistent with other commonly seen images of

3    child pornography and child victimization in that and other chat

4    rooms.  The images of the minor in Count 2 are even more

5    disturbing, including images of the defendant's penis in the

6    minor's mouth as well as semen on the victim's face and mouth.

7        Adding further injury to these grievous wounds of the

8    victims and their loved ones is that virtually all of the minor

9    victims had been entrusted to the defendant by relatives, which

10   he violated in the most horrific ways imaginable.  Obviously the

11   defendant's repeated, insidious sexual abuse of children closest

12   to him over the course of his life requires a substantial

13   sentence.  Moreover, at almost 49 years of age and little

14   understanding of what drove him to such horrific acts, the

15   prospects of rehabilitation are small, although not beyond the

16   possibility if the defendant truly is willing to confront his

17   condition.

18       While the advisory guideline imprisonment range is

19   calculated life imprisonment, imprisonment is effectively capped

20   at a total of 60 years by statute, 30 years per count.  There

21   are really no discernible mitigating factors in this case that

22   would warrant a substantial departure from this range.  Not only

23   are the defendant's crimes difficult to fathom, especially when

24   considering what a range of time they were committed in, his

25   total offense level of 50 well exceeds even 43 at the top of the

1    guideline range.  Even if this court could apply mitigating

2    factors for early upbringing and psychological abuse or

3    vulnerability, it would take a significant reduction to even get

4    below the life term recommended by the advisory guidelines.

5        Regardless, given the defendant's well-documented danger to

6    his community for a great portion of his life, the defendant

7    represents a real danger to the larger community.  I'm not sure

8    there is a way to accommodate the severity of the conduct and

9    still give this particular defendant hope for release.  I think

10   his hope has to be in redemption by confronting what he did, and

11   I will hope that he's able to do that and, even more, help us

12   better understand it as a society.

13       I am persuaded that a custodial sentence of 50 years is

14   reasonable and no greater than necessary to hold the defendant

15   accountable, protect the community, provide the defendant the

16   opportunity for rehabilitative programs, and, importantly,

17   achieve parity with the sentences of similarly situated

18   offenders.

19       As to Count 1 of the indictment, it is adjudged that the

20   defendant is committed to the custody of the Bureau of Prisons

21   for a term of 300 months.

22       As to Count 2 of the indictment, it is adjudged that he is

23   committed to the custody of the Bureau of Prisons for a term of

24   300 months.  Moreover, these terms of imprisonment are to run

25   consecutively for a total imprisonment term of 600 months.

1          I recommend that the defendant receive sex offense

2     counseling and that he be afforded prerelease placement in a

3     residential re-entry center with work release privileges, fully

4     cognizant of the fact that it's unlikely he will live to that

5     point but at least the remote possibility remains.

6          The defendant also has pending charges in Clark County,

7     Wisconsin, Circuit Case No. 2018-CF-20.  According to the U.S.

8     Supreme Court's ruling in *Setser v. United States*, I have the

9     authority to order the federal sentence to run consecutive or

10    concurrent with any sentence that may be imposed.  Because the

11    victims in that matter are the same as those in the current

12    case, that sentence -- or the sentence here shall run

13    concurrently with any sentence that may be imposed in that

14    matter, although given the severity of the sentence, it's

15    probably unlikely that that will be pursued.

16         Under the Sentencing Reform Act of 1984 and given the

17    possibility of supervised release, I will adopt conditions for

18    release, although under the circumstances they would be -- many

19    of them may become unnecessary.  The most important of them

20    would certainly be crucial should he be released in order to

21    adequately deter further criminal conduct and protect the public

22    from further crimes perpetrated by the defendant if, in fact, he

23    is unable to gain from therapy.

24         The postings by the defendant online in chat rooms

25    establish the need for close monitoring.  His abuse of small

1     children, including family members, rather than reducing his

2     risks, in the Court's view only establishes his willingness to

3     continue to abuse, as does his communications, which admit to

4     both a fascination with and abuse of underage boys online and

5     requesting sexual conduct on webcams.

6          Based on the defendant's repeated offenses against minors,

7     the term of imprisonment will be followed by a 25-year term of

8     supervised release.  In light of the nature of the offense and

9     the defendant's personal history, I do adopt conditions 1

10    through 4, 7 through 9, and 11 through 21 as proposed and

11    justified in the presentence report as well as the

12    justifications that I've now put on the record.  I note that

13    neither party objected to the proposals.  Although there is some

14    question as to whether I should state each of them verbatim on

15    the record and justify them individually, it seems that that is

16    something the defense can waive, and so I'll ask whether you

17    wish to waive my doing so.

18          MR. BUGNI:  We would waive it, Your Honor.

19          THE COURT:  If, when the defendant is released from

20    confinement to begin his term of supervised release, either he

21    or the supervising probation officer believes that any of the

22    conditions imposed today are no longer appropriate, you may

23    certainly petition the Court for review.

24          The instant offense is not drug related, and the defendant

25    has no history of drug use.  Therefore, the requirement for drug

1    testing under Section 3583(d) of Title 18 is waived.

2        It is adjudged that the defendant is to pay a $200 criminal

3    assessment penalty by statute.  That is due immediately

4    following sentencing to the Clerk of Court for the Western

5    District of Wisconsin.

6        He is to pay mandatory restitution again to the U.S. Clerk

7    of Court for distribution to the parties.  I understand the

8    parties are unable to agree at this time to restitution, so

9    under statute I will set a restitution hearing, which should

10   be -- well, we probably should set it now, if you could just

11   give me 90 days out.

12       The defendant does not have the means to pay any further

13   fine without impairing his ability to support himself and his

14   family, although realistically a fine would be pointless,

15   particularly if restitution is entered.

16       If the defendant is indigent, which I understand to be the

17   case, the $5,000 assessment under the Justice for Victims of

18   Trafficking Act of 2015 is waived.  I don't know that that has

19   been established, but I guess by virtue of the public defender's

20   role here, I'm willing to find that, unless there's some

21   objection by the government, and so that is waived.

22       A final order of forfeiture will be granted for property

23   seized related to Counts 1 through 3 under Section 2253 of Title

24   18.

25       Finally, the U.S. probation officer is to notify -- U.S.

1    Probation Office is to notify law enforcement agencies and the

2    state attorney general of the defendant's release back into the

3    community.

4        As to Count 3, I believe there's still a motion for the

5    government.

6            MS. ALTMAN:  Yes, Your Honor.  I'd move to dismiss

7    Count 3.

8            THE COURT:  And that is granted.

9        Mr. Bartz, you should probably appeal my sentence, although

10   I did not enter it lightly.  There may be grounds, and I suppose

11   there could even be a change in the law that would provide some

12   relief.  You were very ably represented by counsel, and you

13   should talk to him about possible grounds in the short time you

14   have to appeal, which is 14 days, and he would assist you in

15   filing a notice of appeal, although I do hasten to add that I

16   hope that for the victims they can take some comfort, although

17   it's cold comfort, that the defendant is -- has been sentenced

18   to time which is commensurate with the severity of his crimes

19   and is not likely to be released.  If he is, he'll be a very old

20   man at the time, which maybe is appropriate.

21       For the defendant, I just hope you understand, Mr. Bartz,

22   that you went very far down almost an inconceivable course of

23   conduct, and your sentence reflects that, but I do believe in

24   redemption.  I do believe that there's a possibility for you to

25   confront that and come to grips with it.  Again, I think it's

1    going to take some painful honesty on your part as to what

2    really happened.  You didn't find yourself in these positions.

3    You put yourself in these positions, and you need to understand

4    first why, and then you need to help others understand why, and

5    I hope that's what you will devote your life to doing.

6         Is there anything more for the government at this time?

7              MS. ALTMAN:  No, Your Honor.  Thank you.

8              THE COURT:  Anything more for the defense?

9              MR. BUGNI:  One small matter, Your Honor.  I spoke to

10   Mr. Bartz.  We would waive his appearance at the restitution

11   hearing, if there is one.

12             THE COURT:  All right.  And, Mr. Bartz, that's your

13   preference as well?

14             THE DEFENDANT:  Yes.

15             THE COURT:  All right.  That's noted for the record.

16             MR. BUGNI:  Thank you, Your Honor.

17             THE COURT:  We are adjourned other than I guess I

18   should say to the victims, I hope you'll take seriously my

19   words, and I hope you find comfort.  It's going to take a very

20   long time, but it happens, and it usually happens when you are

21   willing to share the pain with those who care about you and

22   others who have been through it, and so I hope you search out a

23   group that will let you do that.  And I know your children can

24   overcome this with the right support, and I'm certain you'll be

25   an important part of that.

1          Thank you, all.

2              THE CLERK:  This Honorable Court stands adjourned.

3          (Proceedings concluded at 3:06 p.m.)

4                                    ***

5          I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

6      Reporter in and for the State of Wisconsin, certify that the

7      foregoing is a true and accurate record of the proceedings held

8      on the 4th day of October, 2018, before the Honorable

9      William M. Conley, U.S. District Judge for the Western District

10     of Wisconsin, in my presence and reduced to writing in

11     accordance with my stenographic notes made at said time and

12     place.

13         Dated this 16th day of October, 2018.

14

15

16

17

18

19                              _____/s/ Jennifer L. Dobbratz_____

20                              Jennifer L. Dobbratz, RMR, CRR, CRC
                                       Federal Court Reporter
21

22

23

24     The foregoing certification of this transcript does not apply to
       any reproduction of the same by any means unless under the
25     direct control and/or direction of the certifying reporter.